1

2

3                          UNITED STATES DISTRICT COURT

4                          NORTHERN DISTRICT OF CALIFORNIA

5

6

7   ASUS COMPUTER INT'L, et al.,

8           Plaintiffs,                      No. C 14-1743 PJH

9       v.                                   **ORDER CONSTRUING CLAIMS,
                                             DENYING MOTION FOR**
10  EXOTABLET LTD.,                          **PRELIMINARY INJUNCTION**

11          Defendant.

12  _____/

13          Before the court is defendant and counter-plaintiff ExoTablet Ltd.'s motion for

14  preliminary injunction.  Having read the parties' papers and carefully considered their

15  arguments, and the relevant legal authority, the court DENIES the motion as follows.

16                                  **BACKGROUND**

17          This is a patent infringement case.  It was brought as a declaratory judgment action

18  by accused infringers ASUS Computer International and ASUSTeK Computer Inc.

19  (together, "ASUS"), against patent holder ExoTablet Ltd. ("ExoTablet").  In response to the

20  complaint, ExoTablet filed a counterclaim accusing ASUS of infringement, and also filed the

21  present motion for preliminary injunction.

22          ExoTablet seeks to enjoin ASUS from making, using, offering to sell, selling, or

23  importing its PadFone X device in the United States.  ExoTablet alleges that the PadFone

24  X infringes U.S. Patent 7,477,919 ("the '919 patent"), which was filed to cover ExoTablet's

25  own "hybrid" device, the UniversalTransPad (referred to as the "UTP").

26          Both devices are referred to as "hybrid smartphone/tablet" devices that "combine[] a

27  smartphone with a cradle in a 'dumb' tablet such that the 'dumb' tablet (i) effectively

28  enlarges and enhances the screen size of the smartphone, (ii) provides an enlarged and

**United States District Court**
For the Northern District of California

United States District Court

For the Northern District of California

1   enhanced user interface (touch screen) for the smartphone, and (iii) displays what is, or

2   otherwise would be, displayed on the smartphone."  In other words, each device is a tablet

3   shell (also referred to as a tablet dock, and referred to in this order as an "input/output

4   device," based on the language used in the patent-in-suit).

5       Before this suit was filed, ExoTablet approached ASUS in the hopes of reaching an

6   agreement to license the '919 patent.  However, ASUS decided not to agree to a license,

7   and instead, filed suit against ExoTablet on April 16, 2014, seeking a declaratory judgment

8   that the PadFone X does not infringe ExoTablet's patent.  On May 21, 2014, ExoTablet

9   answered the complaint, filed a counterclaim of infringement, and filed the present motion

10  for preliminary injunction.  At the time that the motion was filed, neither the UTP nor the

11  PadFone X had been released, and ExoTablet thus sought to "preserve" the "brand-new"

12  hybrid tablet/smartphone market, and retain its "first-mover advantage."

13      In its motion, ExoTablet took the position that "no formal claim construction is

14  necessary because the claims of the '919 patent use simple, clear terms that should all be

15  accorded their plain and ordinary meaning."  However, after ASUS offered proposed

16  constructions for four claim terms in its opposition brief, ExoTablet responded with new

17  evidence (in the form of two expert declarations) supporting its view of how the terms

18  should be construed.

19      At the hearing, the court informed the parties that the disputed claim terms would

20  need to be construed before the preliminary injunction motion could be decided, and that

21  the court would not re-construe those terms later in the case.  Thus, to ensure that both

22  parties could be fully heard before the terms were construed, the court allowed ASUS to file

23  a supplemental brief, in order to attempt to rebut the expert declarations filed with

24  ExoTablet's reply.  This supplemental brief (which was filed on July 9, 2014), in conjunction

25  with the arguments presented by both parties at the preliminary injunction hearing, ensures

26  that both sides have been fully heard on the issue of claim construction as to the four terms

27  that are currently disputed.  Accordingly, the court will construe the disputed terms before

28  addressing ExoTablet's motion for preliminary injunction.

**United States District Court**
For the Northern District of California

**DISCUSSION**

A.   Claim construction

    1.   Legal standard

     In construing claims, the court must begin with an examination of the claim language itself. The terms used in the claims are generally given their "ordinary and customary meaning." See Phillips v. AWH Corp., 415 F.3d 1303, 1312-13 (Fed. Cir. 2005); see also Renishaw PLC v. Marposs Societa' per Azioni, 158 F.3d 1243, 1248 (Fed. Cir. 1998) ("The claims define the scope of the right to exclude; the claim construction inquiry, therefore, begins and ends in all cases with the actual words of the claim."). This ordinary and customary meaning "is the meaning that the terms would have to a person of ordinary skill in the art in question at the time of the invention." Phillips, 415 F.3d at 1313. A patentee is presumed to have intended the ordinary meaning of a claim term in the absence of an express intent to the contrary. York Products, Inc. v. Central Tractor Farm & Family Ctr., 99 F.3d 1568, 1572 (Fed. Cir. 1996).

     Generally speaking, the words in a claim are to be interpreted "in light of the intrinsic evidence of record, including the written description, the drawings, and the prosecution history, if in evidence." Teleflex, Inc. v. Ficosa North Am. Corp., 299 F.3d 1313, 1324-25 (Fed. Cir. 2002) (citations omitted); see also Medrad, Inc. v. MRI Devices Corp., 401 F.3d 1313, 1319 (Fed. Cir. 2005) (court looks at "the ordinary meaning in the context of the written description and the prosecution history"). "Such intrinsic evidence is the most significant source of the legally operative meaning of disputed claim language." Vitronics Corp. v. Conceptronic, Inc., 90 F.3d 1576, 1582 (Fed. Cir. 1996).

     With regard to the intrinsic evidence, the court's examination begins, first, with the claim language. See id. Specifically, "the context in which a claim is used in the asserted claim can be highly instructive." Phillips, 415 F.3d at 1314. As part of that context, the court may also consider the other patent claims, both asserted and unasserted. Id. For example, as claim terms are normally used consistently throughout a patent, the usage of a term in one claim may illuminate the meaning of the same term in other claims. Id. The

United States District Court
For the Northern District of California

1   court may also consider differences between claims to guide in understanding the meaning

2   of particular claim terms.

3       Second, the claims "must [also] be read in view of the specification, of which they

4   are a part." Id. at 1315.  When the specification reveals a special definition given to a claim

5   term by the patentee that differs from the meaning it would otherwise possess, the

6   inventor's lexicography governs. Id. at 1316.  Indeed, the specification is to be viewed as

7   the "best source" for understanding a technical term, informed as needed by the

8   prosecution history. Id. at 1315.  As the Federal Circuit stated in Phillips, the specification

9   is "the single best guide to the meaning of a disputed term," and "acts as a dictionary when

10  it expressly defines terms used in the claims or when it defines terms by implication."  415

11  F.3d at 1321.

12      Limitations from the specification, such as from the preferred embodiment, cannot

13  be read into the claims absent an express intention to do so.  Teleflex, 299 F.3d at 1326

14  ("The claims must be read in view of the specification, but limitations from the specification

15  are not to be read into the claims.") (citations omitted); CCS Fitness, Inc. v. Brunswick

16  Corp., 288 F.3d 1359, 1366 (Fed. Cir. 2002) ("a patentee need not describe in the

17  specification every conceivable and possible future embodiment of his invention."); Altiris v.

18  Symantec Corp., 318 F.3d 1363, 1372 (Fed. Cir. 2003) ("resort to the rest of the

19  specification to define a claim term is only appropriate in limited circumstances").  To

20  protect against this, the court should not consult the intrinsic evidence until after reviewing

21  the claims in light of the ordinary meaning of the words themselves.  Texas Digital

22  Systems, Inc. v. Telegenix, Inc., 308 F.3d 1193, 1204-05 (Fed. Cir. 2002) (to act otherwise

23  "invites a violation of our precedent counseling against importing limitations into the

24  claims") (citations omitted).

25      Finally, as part of the intrinsic evidence analysis, the court "should also consider the

26  patent's prosecution history, if it is in evidence."  Phillips, 415 F.3d at 1317.  The court

27  should take into account, however, that the prosecution history "often lacks the clarity of the

28  specification" and thus is of limited use for claim construction purposes.  Id.

4

United States District Court
For the Northern District of California

1    In most cases, claims can be resolved based on intrinsic evidence.  See Vitronics,

2    90 F.3d at 1583.  Only if an analysis of the intrinsic evidence fails to resolve any ambiguity

3    in the claim language may the court then rely on extrinsic evidence, such as expert and

4    inventor testimony, dictionaries, and learned treatises.  See Vitronics, 90 F.3d at 1583 ("In

5    those cases where the public record unambiguously describes the scope of the patented

6    invention, reliance on any extrinsic evidence is improper").  However, the court generally

7    views extrinsic evidence as less reliable than the patent and its prosecution history in

8    determining how to read claim terms, and its consideration is within the court's sound

9    discretion.  See Phillips, 415 F.3d at 1318-19.

10           2.     Construction of disputed terms and phrases

11           The parties dispute the construction of four terms or phrases[1] contained within claim

12    1 of the patent-in-suit, which are addressed in turn below.

13                  a.     "handheld"

14           ExoTablet argues that this term should be given its "ordinary common meaning,"

15    which is that something is "holdable in one's hand."  ASUS argues that the term should be

16    construed as "pocketsize and used in one hand."

17           For support, ASUS cites to the patent's specification, which states that the product

18    "can be held in the user's hand when in use," and which identifies specific comparable

19    products.  '919 patent, column 8, lines 8-12.  ASUS includes pictures of each of these

20    products (the Blackberry PDA, among others) in its opposition brief, to show that they are

21    all "pocket-size and used in one hand."  ASUS further cites to the patent's prosecution

22    history, during which the examiner described the invention as being "small enough to be

23    hand-held while in use," a description which ExoTablet did not dispute.

24

25    _____

26    [1]In its supplemental brief, ASUS also proposed constructions for two new terms ("input/output device" and the last "wherein" clause), claiming that ExoTablet's reply brief included "new construction[s]" for these terms. Dkt. 44 at 9-10.  ExoTablet later clarified that
27    it had not proposed those terms for construction, and that "the only terms for construction before the court are those addressed at the hearing." Dkt. 52 at 4.  The court agrees with
28    ExoTablet, and will construe only those four terms that were addressed at the hearing.

United States District Court
For the Northern District of California

1    ExoTablet argues that the term "handheld" can encompass tablet-sized devices, and

2    maintains that ASUS lacks support for its "pocketsize" limitation.

3    Overall, the court agrees with ASUS that the specification states that the device "can

4    be held in the user's hand when in use," but finds no support for ASUS' "pocketsize"

5    limitation.  Accordingly, the court construes "handheld" as **"holdable and usable in one's**

6    **hand**."

7              b.    "carried by hand"

8    ExoTablet argues that this term should be given its plain and ordinary meaning,

9    which is that something is "carried, or carriable, by hand."  ASUS argues that the term

10   should be construed as "carried in one hand like a cell phone."

11   ASUS bases its argument on the fact that the patent's specification draws a

12   distinction between laptops and cell phones, the latter of which are described as

13   "convenient to carry around, relative to laptops."

14   ExoTablet argues that the patent is not limited to devices that are "carried in <u>only</u>

15   one hand like a cell phone," as the "purpose of the invention is to provide a larger-format

16   interface than the typical cell phone provides."

17   The court finds no support for ASUS' construction, because while the patented

18   device certainly must be capable of being carried by hand, it need not be carried "like a cell

19   phone."  However, because ExoTablet's proposed construction largely parrots the actual

20   claim language, and because both parties use the word "carried" in their proposed

21   constructions, the court declines to construe this term, and instead lets plain and ordinary

22   meaning govern.

23              c.    "cradle"

24   ExoTablet argues that this term is a "well-known term of art" that refers to an

25   "electronic docking station."  ASUS argues that the term should be construed as "the top

26   surface of an adapter."

27   ASUS' proposed construction is based on the specification's statement that "the

28   adapter [160] can have a curved top surface that forms a cradle for a portable phone with a

United States District Court

For the Northern District of California

curved bottom." '919 patent, column 8, lines 31-33.

ExoTablet argues that the specification "simply describes one example of a preferred geometry of a particular cradle – namely, a cradle designed to accommodate the recited 'telephone with a curved bottom.'"

The court agrees with ExoTablet, especially given that ASUS' quoted portion of the specification is clear in stating that the adapter "<u>can</u> have a curved top surface." Nothing in the specification requires the cradle to be located on the top surface of an adapter. However, ExoTablet's cited evidence defines "cradle" as a "dock" or "docking station," rather than an "electronic docking station." <u>See</u> Dkt. 33, ¶ 54. Accordingly, the court construes "cradle" to mean a "**docking station**."

                    d.     "providing a wirelessly portable interface"

As an initial matter, the court notes that claim 1 does not use the same phrasing as that presented by the parties, as the actual claim language describes the input/output device as "providing a handheld, wirelessly portable, enhanced user interface" for the mobile telephone. '919 patent, column 10, lines 9-11. However, rather than presenting the phrase as "providing a . . . wirelessly portable . . . interface," the court will present the phrase in the same manner as did the parties.

ExoTablet argues that this phrase "means that the hybrid device is wirelessly portable due to the fact that it has no dangling wires." ASUS argues that the phrase "means that the claimed input/output device must include its own wirelessly portable interface not provided by the mobile phone."

For support, ExoTablet relies on language in the specification stating that "there are no dangling wires between the phone and the device." '919 patent, column 9, lines 61-62.

ASUS also points to the specification for support, focusing on a passage stating that the input/output device "can include a wireless transmitter and a wireless receiver that send and receive radio or other frequency signals to and from the portable phone . . . or the port can be provide [sic] by an infrared or other optical transmitter and receiver for communicating with similar components on a modified portable phone." '919 patent,

7

1   column 6, line 65–column 7, line 4.

2        ExoTablet argues that ASUS' proposed construction is refuted by the principle of

3   claim differentiation – specifically, because claim 17 specifically requires "wireless

4   communication . . . between the input/output device and the mobile telephone," claim 1

5   should not be interpreted to cover the same claim scope.

6        The court finds that both parties' proposals are flawed.  The best insight as to the

7   meaning of "providing a wirelessly portable interface" actually comes from the claim

8   language itself, which explains that:

9        the mobile telephone input/output device holding the mobile telephone is
         configured to be conveniently operated while handheld and used as an
10       integrated wireless communication device in which the mobile telephone
         engages in wireless communications while the input/output device operates
11       as a handheld, wirelessly portable, enhanced user interface for the mobile
         telephone.
12

13  '919 patent, claim 1 (emphasis added).

14       Based on that claim language, the court finds that the input/output device, when

15  combined with the mobile phone, must provide a wirelessly portable interface for the

16  combined device.  In other words, when the devices are combined, they must be capable of

17  use without any wires (i.e., no power cord, no Internet cable, etc.).  Interestingly, the

18  declaration of David Hughes (filed with ExoTablet's reply) does mention this interpretation,

19  stating that one potential interpretation of "providing a wirelessly portable interface" is that

20  "the communications between the integrated input/output device-mobile telephone

21  combination and the 'off-board' or 'outside' world" must have wireless capability."  Dkt. 33,

22  ¶ 63.  However, Dr. Hughes ultimately concludes that the phrase means that "the portable

23  interface has no dangling wires between the mobile telephone and the interface."  Id., ¶ 79.

24  The court disagrees with Dr. Hughes' conclusion, and instead construes "providing a

25  wirelessly portable interface" to mean "**providing a means for the combined device to**

26  **operate and communicate without any external wires**."

27

28

                                        8

United States District Court

For the Northern District of California

B.     Motion for preliminary injunction

Having construed the disputed terms, the court will now address the merits of ExoTablet's motion for preliminary injunction.

1.     Legal standard

A plaintiff (or, in this case, a counter-plaintiff) seeking a preliminary injunction must establish that it is likely to succeed on the merits, that it is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in its favor, and that an injunction is in the public interest.  Winter v. Natural Resources Defense Council, Inc., 129 S.Ct. 365, 374 (2008).

An injunction is a matter of equitable discretion" and is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." Winter, 129 S.Ct. at 376, 381.

In this circuit, a party seeking an injunction may alternatively demonstrate that serious questions going to the merits were raised and that the balance of hardships tips sharply in its favor, "so long as the plaintiff also shows that there is a likelihood of irreparable injury and that the injunction is in the public interest."  Alliance for Wild Rockies v. Cottrell, 632 F.3d 1127, 1135 (9th Cir. 2011).  However, because the injunction sought by ExoTablet is based on the alleged "violation of any right secured by a patent," the law of the Federal Circuit applies.  See Hybridtech, Inc. v. Abbott Laboratories, 849 F.2d 1446, 1451 n.12 (Fed. Cir. 1988) (regional circuit law applies only to "purely procedural questions").

2.     Legal analysis

a.     Likelihood of success on the merits

To show a likelihood of success on the merits, ExoTablet must "demonstrate that it will likely prove infringement of one or more claims" of the patent-in-suit, and "that at least one of those same allegedly infringed claims will also likely withstand the validity challenges presented by the accused infringer."  Astra-Zenica LP v. Apotex, Inc., 633 F.3d 1042, 1050 (Fed. Cir. 2010).

1    To successfully rebut any showing of likelihood of success on the merits, ASUS

2  need only raise a "substantial question of invalidity," rather than meeting the "clear and

3  convincing evidence" burden that would be applicable at trial.  Altana Pharma AG v. Teva

4  Pharmaceuticals USA, Inc., 566 F.3d 999, 1005-06.  If ASUS raises a "substantial

5  question" of invalidity, the burden would then shift to ExoTablet to "show that the defense

6  lacks substantial merit."  Id. at 1006.

7    ExoTablet argues that it is likely to succeed on its counterclaim of infringement of

8  claim 1 of the '919 patent.  ASUS raises three challenges: (1) the accused device does not

9  infringe claim 1, (2) certain terms of claim 1 (specifically, "conveniently carried by hand" and

10 "conveniently operated while handheld") are indefinite, rendering claim 1 invalid, and (3)

11 claim 1 is anticipated and/or obvious in light of two cited prior art references ("Kumar" and

12 "Lebby," described in more detail below).

13                              i.    Infringement

14    In its motion, ExoTablet argued that none of claim 1's terms needed to be construed,

15 and that ASUS' PadFone X met every claim limitation under the plain and ordinary meaning

16 of each claim term.  In its opposition, ASUS argued its product "does not infringe claim 1 of

17 the '919 patent because the PadFone X is not 'handheld,' is not 'carried by hand,' lacks a

18 'cradle,' and is not 'wirelessly portable,' as required by the claim."  Having now construed

19 those four terms, the court will now determine whether ExoTablet is likely to succeed on the

20 merits of its infringement argument.

21    The court has construed the term "handheld" to mean "holdable and usable in one's

22 hand."  ExoTablet argues that the tablet-sized PadFone X is indeed holdable and usable in

23 one's hand, while ASUS' non-infringement argument is based on the inclusion of the word

24 "pocketsize" in its proposed construction, which would exclude tablet-sized devices from

25 claim 1's scope.  Having rejected the "pocketsize" limitation, the court finds that a tablet-

26 sized device is "holdable and usable in one's hand," and thus, ExoTablet is likely to

27 succeed on the merits of its infringement argument as to the term "handheld."

28    The court did not construe the term "carried by hand," and instead allowed the

10

term's plain and ordinary meaning to govern.  ExoTablet argues that the tablet-sized PadFone X can indeed be carried by hand, while ASUS' non-infringement argument is based on its proposed construction that the device must be "carried in one hand like a cell phone."  Having rejected ASUS' proposed construction, the court finds that the PadFone X can indeed be carried by hand, and thus, the court finds that ExoTablet is likely to succeed on the merits of its infringement argument as to the term "carried by hand."

The court has construed the term "cradle" to mean "docking station."  ExoTablet argues that the PadFone X has a place for the mobile phone to dock into the tablet shell, thus meeting this limitation.  ASUS' non-infringement argument is based on the requirement, in its proposed construction, that the cradle consist of a "curved top surface" on the device.  Having rejected ASUS' proposed construction, the court finds that ExoTablet is likely to succeed on the merits of its infringement argument as to the term "cradle."

The court has construed the term "providing a wirelessly portable interface" to mean "providing a means for the combined device to operate and communicate without any external wires."  Even though ExoTablet proposed a different construction of this term, it did argue (in its reply) that "in at least one claimed configuration the inventive device and the mobile phone serve as an 'integrated wireless communication device.'" Dkt. 28 at 6.  ASUS' non-infringement argument is based on the requirement, in its proposed construction, that the tablet shell have independent wireless communication capability.  The court rejected ASUS' construction, and found that claim 1 required only that the combined (i.e., integrated) device have wireless capability.  The evidence cited by ExoTablet (in particular, the PadFone X commercial shown at the hearing) shows that the integrated PadFone X device (i.e., the tablet shell with the phone docked) has wireless capability, and thus, the court finds that ExoTablet is likely to succeed on the merits of its infringement argument as to the term "providing a wirelessly portable interface."

Based on the foregoing, the court finds that ExoTablet is likely to succeed on the merits of its claim that the accused device meets the limitations of claim 1.  However, in

1   order to determine whether a preliminary injunction is warranted, the court must first

2   address ASUS' invalidity defenses.

3                           ii.      Invalidity – indefiniteness

4         As discussed above, in order to defeat ExoTablet's motion, ASUS need not show

5   that the '919 patent is invalid by "clear and convincing evidence."  Instead, it need only

6   raise a "substantial question of invalidity," after which the burden would shift to ExoTablet to

7   show that the invalidity defense "lacks substantial merit."

8         ASUS' first invalidity defense is based on the argument that the terms "conveniently

9   carried by hand" and "conveniently operated while handheld" (referred to as "the

10  'conveniently' terms") are indefinite, rendering claim 1 invalid.  The Supreme Court recently

11  articulated a new standard for indefiniteness, holding that "a patent is invalid for

12  indefiniteness if its claims, read in light of the specification delineating the patent, and the

13  prosecution history, fail to inform, with reasonable certainty, those skilled in the art about

14  the scope of the invention." Nautilus, Inc. v. Biosig Instruments, Inc., 134 S.Ct. 2120, 2124

15  (2014).

16        ASUS argues that the "conveniently" terms are indefinite under the "reasonable

17  certainty" standard, and cites to the Federal Circuit's opinion in Datamize, LLC v. Plumtree

18  Software, Inc. for support.  417 F.3d 1342 (Fed. Cir. 2005).  The Datamize court held that

19  the term "aesthetically pleasing" was indefinite, as it "depend[ed] solely on the unrestrained,

20  subjective opinion of a particular individual purportedly practicing the invention" and that a

21  "purely subjective construction . . . would not notify the public of the patentee's right to

22  exclude since the meaning of the claim language would depend on the unpredictable

23  vagaries of any one person's opinion of the aesthetics of interface screens."  417 F.3d at

24  1350.  The court notes that Datamize was decided under an indefiniteness standard which

25  required an accused infringer to show that a term was "insolubly ambiguous," a stricter

26  standard than the current "reasonable certainty" standard.

27        ASUS argues that the "conveniently" terms are "completely dependent on a person's

28  subjective opinion," making the scope of the claim terms uncertain, as was the case in

United States District Court
For the Northern District of California

United States District Court

For the Northern District of California

1   <u>Datamize</u>.  ASUS argues that a person with large hands might find certain phones

2   convenient to operate while handheld or convenient to carry by hand, while others may not.

3       ExoTablet responds by arguing that "conveniently carried by hand" means "that the

4   size, weight, bulkiness, and/or expense is less than that of a typical laptop computer," and

5   that the term "conveniently operated while handheld" means that "the display screen for the

6   inventive device is larger than the display screen of a typical mobile telephone, that a

7   QWERTY-type keyboard is included with the inventive device, or both."  ExoTablet also

8   points out that "the word 'conveniently' appears in several other issued patents further

9   indicating that the term has a common ordinary meaning that is not indefinite."

10      Here, the court finds the analysis set forth by the <u>Datamize</u> court to be instructive.

11  The court explained that "when faced with a purely subjective phrase . . . a court must

12  determine whether the patent's specification supplies some standard for measuring the

13  scope of the phrase." 417 F.3d at 1351 (quoting <u>Seattle Box Co. Industrial Crating &</u>

14  <u>Packing, Inc.</u>, 731 F.2d 818, 826 (Fed. Cir. 1984)).

15      As to the phrase "conveniently carried by hand," the specification does refer to the

16  fact that cell phones are "small, lightweight, and convenient to carry around, relative to

17  laptops" which provides some context for the admittedly-subjective[2] term "convenient."  <u>See</u>

18  '919 patent, column 1, lines 41-42.  However, the court is puzzled by ExoTablet's

19  suggestion that the "expense" of the device bears on the convenience of carrying it around.

20  Despite the inherent subjectivity of the term "convenient," the court does find that the

21  specification's comparison between phones and laptops appears to "suppl[y] some

22  standard for measuring the scope of the phrase," and thus, finds that ASUS has not raised

23  a "substantial question of invalidity" regarding the indefiniteness of the term "conveniently

24  carried by hand."

25

26  ──────────────

27      [2]The dictionary definition of "convenient" that ExoTablet provides (in the Hughes declaration) supports ASUS' argument that the term is subjective, as it defines "convenient"

28  to mean "suited or favorable to <u>one's</u> comfort, purpose, or needs."  Dkt. 33 at ¶ 40 (from the American Heritage College Dictionary) (emphasis added).

1    As to the phrase "conveniently operated while handheld," ExoTablet's expert

2  declaration offers the following explanation of its meaning:

3

4        "[C]onveniently operated while handheld" can indicate that the inventive
         device possesses a larger display screen (as opposed to the handicap of a
5        "small screen" typical of the mobile telephones of the era and described [at]
         '919 patent, Column 1, Lines 52-53; or the handicap of a "mini-screen" typical
6        of the mobile telephones of the era and described [at] '919 patent, Column 2,
         lines 1-8) – and/or that the inventive device possesses a keyboard (as
7        opposed to the handicap of a "small keypad" typical of the mobile telephones
         of the era and described [at] '919 patent, Column 1, lines 52-53; or the
8        handicap of a "mini-keypad" typical of the mobile telephones of the era and
         described [at] '919 patent, Column 2, lines 1-8).

9  Hughes decl. (Dkt. 33), ¶ 44.

10    The court does not find that those cited passages ""suppl[y] some standard for

11  measuring the scope" of the term "conveniently operated while handheld."  Instead,

12  ExoTablet's expert has merely cited passages discussing distinctions between the claimed

13  invention and the prior art, and assumed that those distinctions make the claimed invention

14  "conveniently operated while handheld."  While the claimed invention's inclusion of a

15  QWERTY keyboard may indeed make it more attractive to users than a mobile phone with

16  a "mini-keypad," the larger keyboard does not make the claimed invention more

17  "convenient" to operate while handheld – if anything, a QWERTY keyboard would require

18  two hands to type, which would preclude its use "while handheld."  Similarly, the claimed

19  invention's larger screen may make it more attractive to users than a phone with a small

20  screen, but the specification does not connect the larger screen with the convenience of

21  operating the device while handheld.  Thus, even read in light of the specification, the term

22  "conveniently operated while handheld" appears not to "inform, with reasonable certainty,

23  those skilled in the art about the scope of the invention."  Accordingly, the court finds that

24  ASUS has raised a "substantial question of invalidity" regarding the indefiniteness of the

25  term "conveniently operated while handheld," and ExoTablet has not shown that the

26  defense "lacks substantial merit."

27                    iii.    Invalidity – anticipation/obviousness

28    Although the court need not address this invalidity argument, based on the finding

14

United States District Court

For the Northern District of California

1  that ASUS has already raised a substantial question of invalidity as to indefiniteness, the

2  court finds that anticipation/obviousness provides an independent basis for finding a

3  substantial question of invalidity.

4       A patent is anticipated, and therefore invalid, under 35 U.S.C. § 102(a) if the

5  invention "was known or used by others in this country, or patented or described in a

6  printed publication in this or a foreign country" before the patent was filed.  A patent is

7  anticipated under 35 U.S.C. § 102(b) if the invention was "patented or described in a

8  printed publication in this or a foreign country or in public use or on sale in this country"

9  more than a year before the filing date.  An anticipation defense requires a single prior art

10  reference that "discloses, either expressly or inherently, each limitation" of a claimed

11  invention.  Perricone v. Medicis Pharmaceutical Corp., 432 F.3d 1368, 1375 (Fed. Cir.

12  2005).

13       A patent is obvious, and therefore invalid, under 35 U.S.C. § 103 "if the differences

14  between the subject matter sought to be patented and the prior art are such that the

15  subject matter as a whole would have been obvious at the time the invention was made to

16  a person having ordinary skill in the art."  "Obviousness" is a question of law based on

17  underlying factual findings: (1) the scope and content of the prior art; (2) the differences

18  between the claims and the prior art; (3) the level of ordinary skill in the art; and (4)

19  objective indicia of nonobviousness.  See, e.g., Kinetic Concepts, Inc. v. Smith & Nephew,

20  Inc., 688 F.3d 1342, 1360 (Fed. Cir. 2012).  Unlike an anticipation defense, an obviousness

21  defense may be based on a combination of multiple prior art references, but only if the

22  accused infringer can show that "a skilled artisan would have been motivated to combine

23  the teachings of the prior art references to achieve the claimed invention, and that the

24  skilled artisan would have had a reasonable expectation of success in doing so."  Id.

25       ASUS argues that the '919 patent is anticipated and/or obvious in light of two prior

26  art references: (1) international patent application WO00/60450, titled "Portable Computing,

27  Gaming, Communication and Entertainment Device with Central Processor Carried in a

28  Detachable Handset" (referred to as the "Kumar" reference), published on October 12,

15

United States District Court

For the Northern District of California

2000, and (2) U.S. Patent No. 6,115,618, titled "Portable Electronic Device with Removable Display" (referred to as the "Lebby" reference), issued on September 5, 2000.  ASUS points out that the earliest claimed priority date in the '919 patent is September 19, 2002, making both Kumar and Lebby prior art under either 35 U.S.C. § 102(a) or § 102(b).

ASUS' opposition brief focuses on the Kumar reference, arguing that it "discloses a handheld docking display unit for docking a wireless phone handset," where "much of the hardware and intelligence reside in the wireless phone handset, including the processor, communication circuit, speaker, microphone, and power supply."  The "docking display unit" (which ASUS argues is equivalent to the "input/output device" of the '919 patent) can be used for "applications requiring a larger display and keyboard."  In its brief, ASUS walks through each element of claim 1 of the '919 patent, arguing that each is disclosed by Kumar.  See Dkt. 25 at 13-18.

In its reply, ExoTablet argues that Kumar fails to disclose at least two of claim 1's elements: (1) element [1g], which requires the input/output device be "used to control the mobile telephone," and (2) element [1h], which requires that the input/output device "operates as a handheld, wirelessly portable, enhanced user interface for the mobile telephone."

Regarding the "control" limitation, ExoTablet argues that, in Kumar, "all of the computing power and control of the system resides in the handset (i.e., the mobile phone), rather than the display."  ExoTablet argues that Kumar thus "stands in stark contrast to the invention of the '919 patent," in which the input/output device "contains processing, data storage, and control functionality for the system, including processor, memory, and a battery."

However, ExoTablet appears to be requiring too much of Kumar, which need only anticipate the elements recited in claim 1, and not any features of any preferred embodiments of the patented invention.  Claim 1 does not require the input/output device to contain a processor or memory, it requires only that the input/output device be "used to control the mobile telephone."  '919 patent, column 10, lines 29-30.  Kumar does disclose a

16

United States District Court

For the Northern District of California

1   "docking display unit" (i.e., an "input/output device") with a keyboard and a "pen-input

2   panel," for use when the phone is docked into the display unit.  <u>See</u> Dkt. 33, Ex. 14 at 10.

3   Even though the phone itself contains all of the computing power for the device, as long as

4   the display unit's keyboard (and/or pen-input panel) can receive inputs from the user, then

5   transmit those inputs to the phone, then the display unit does exert some level of "control"

6   over the phone.  In other words, claim 1 does not require that the input/output device <u>wholly</u>

7   control the mobile phone, it requires only that the input/output device be "used to control

8   the mobile telephone," and thus, even partial control will suffice.

9         ExoTablet attempts to read new limitations into the "control" element, arguing that

10   the '919 patent teaches an invention with a touchscreen, whereas Kumar does not use the

11   word "touchscreen" at all, and teaches only a "pen-input panel" which is distinct from a

12   touchscreen.  But as mentioned above, Kumar need only disclose the elements of claim 1

13   itself, and claim 1 does not recite a touchscreen.  Thus, based on Kumar's disclosure of a

14   keyboard and a pen-input panel, the court rejects ExoTablet's challenge to Kumar based

15   on the alleged failure to disclose an input/output device "used to control the mobile

16   telephone."

17         Regarding the "wirelessly portable" limitation, ExoTablet argues that Kumar's

18   "docking display unit" is not "wirelessly portable" because "it lacks any internal power

19   supply."  Thus, the display unit must be plugged into a power outlet in order to function,

20   making it neither "wireless" nor "portable."

21         The court notes that Kumar does expressly reference a "power jack," such as "an

22   AC adapter/charger jack," on the docking display unit.  Dkt. 33, Ex. 14 at page 5, line 28;

23   Fig. 3.  However, as ASUS points out in its supplemental brief, Figure 3 also teaches that

24   the phone itself has a "power supply" that connects to the display unit's "power supply bus,"

25   suggesting that the phone could supply power to the display unit, without the need to use

26   the supplied power jack.  Moreover, the court notes that the "background art" section of

27   Kumar mentions a product by Motorola where both the phone and the dock were "designed

28   to operate as individual, standalone units that each furnish its own processor and power

17

United States District Court
For the Northern District of California

1   supply." Dkt. 33, Ex. 14 at page 2, lines 11-12.  While Kumar opted not to go with this

2   approach, as it "does not achieve the reduced size or cost desired in an integrated

3   combination," the reference to Motorola's invention does suggest that one having ordinary

4   skill in the art would have been motivated to modify Kumar to include a power supply.

5   ASUS argues as much, maintaining that "it would have been obvious to one of skill in the

6   art to modify the docking display unit in Kumar to provide a wirelessly portable interface on

7   its own that is not provided by the mobile phone."  The court thus rejects ExoTablet's

8   challenge to Kumar based on the alleged failure to disclose, or to make obvious, an

9   input/output unit that is "wirelessly portable."

10       As to the "wirelessly portable" element, ASUS also argues that "Lebby discloses an

11   input/output device" that "provides a wirelessly portable interface on its own that is not

12   provided by the mobile phone," and that "[o]ne of skill in the art would have been motivated

13   to combine the teachings of Kumar and Lebby because both deal with docking display units

14   for mobile devices including cell phones."  The court will address this argument after

15   discussing Lebby more fully.

16       Lebby discloses a detachable display unit that can be attached to a "portable

17   electronic device" (such as a mobile telephone) that provides a larger display than the one

18   included on the phone/device itself.

19       ASUS' opposition brief contains only one paragraph of discussion regarding Lebby,

20   and its supplemental brief responds only to challenges raised by ExoTablet, rather than

21   providing an element-by-element comparison of Lebby to claim 1 of the '919 patent.  While

22   the declaration of Peter Roach purports to contain a claim chart with an element-by-

23   element comparison, that chart merely parrots the claim language and asserts, without

24   explanation, that Lebby discloses each element.  See Dkt. 26, ¶ 37.  Thus, because of the

25   lack of evidence provided by ASUS, the court cannot make any determination as to

26   whether Lebby anticipates the patent-in-suit.

27       However, the court does note that Lebby specifically discloses a "detachable display

28   unit" (i.e., an input/output device) that contains its own battery, and is thus "wirelessly

18

United States District Court
For the Northern District of California

1   portable."  See Dkt. 33, Ex. 24 at column 4, lines 64-65 ("The new and improved

2   detachable display and battery combination is designed for use in small handheld

3   electronic devices").  The court further finds that both Lebby and Kumar disclose inventions

4   which can connect to a mobile telephone and provide a larger display screen than the

5   phone itself can provide.  Thus, one having ordinary skill in the art would have been

6   motivated to combine Lebby's separate battery with the "docking display unit" disclosed in

7   Kumar.  As a result, the court finds that ASUS has raised a "substantial question of

8   invalidity" by arguing that Kumar, either by itself or in combination with Lebby, anticipates

9   and/or renders obvious claim 1 of the '919 patent, and that ExoTablet has not shown that

10  this defense lacks substantial merit.

11        The court emphasizes that it does not rule on the ultimate validity of claim 1, as the

12  court has not evaluated claim 1 under the "clear and convincing" evidentiary burden that is

13  applicable to invalidity defenses at trial.  However, for the purposes of this motion, the court

14  does find that ASUS has raised a substantial question of invalidity, based on its arguments

15  regarding the indefiniteness of the term "conveniently operated while handheld" and the

16  anticipation/obviousness of claim 1 in light of Kumar and/or Kumar and Lebby.  The court

17  further finds that ExoTablet has not shown that ASUS' defenses lack substantial merit.

18  Thus, the court finds that ExoTablet cannot demonstrate a likelihood of success on the

19  merits of its claim of infringement of the '919 patent under Winter.

20            b.    Irreparable harm

21        When ExoTablet filed its motion on May 21, 2014, it sought an order preventing

22  ASUS from making, using, offering to sell, selling, or importing its PadFone X device in the

23  United States.  At the time, the PadFone X had not been released, and no specific release

24  date had been announced – ASUS' CEO had announced only a release date sometime in

25  the second quarter of 2014.

26        When ASUS filed its opposition brief on June 6, 2014, it represented to the court that

27  AT&T "will begin accepting pre-orders for the PadFone X on June 6, 2014, and will sell the

28  PadFone X for $199 on a two-year contract and other pricing plans."  Dkt. 25 at 2.  No

19

United States District Court

For the Northern District of California

1    additional information regarding the PadFone X's release date was contained in the

2    opposition brief.

3         However, at the hearing, ASUS' counsel informed the court that the PadFone X had

4    already been <u>released</u> – not just made available for pre-order – on June 6, 2014.[3]  <u>See</u> Dkt.

5    42 at 37.  Based on this new information, the court directed ExoTablet to file a post-hearing

6    brief discussing how the PadFone X's release affected the requested preliminary injunction,

7    as the requested relief no longer sought to merely preserve the status quo.  ExoTablet filed

8    its brief on July 16, 2014, arguing that ASUS "should not be allowed to sell any additional

9    infringing units," and noting that courts have previously issued preliminary injunctions

10   preventing the further sale of products already on the market.  <u>See</u> Dkt. 52 at 2.

11        The court agrees that an injunction may be appropriate even in cases where the

12   accused product has already been released.  <u>See, e.g.</u>, <u>Blackberry Ltd. v. Typo Products</u>

13   <u>LLC</u>, 2014 WL 1318689 (N.D. Cal. Mar. 28, 2014); <u>Oakley, Inc. v. Sunglass Hut Int'l</u>, 2001

14   WL 1683252 (C.D. Cal. Dec. 7, 2001).  However, given that the court has found that

15   ExoTablet has failed to demonstrate a likelihood of success on the merits, it does not reach

16   the irreparable harm prong and does not analyze ExoTablet's arguments about the first-

17   mover advantage.  Similarly, the court does not address the remaining <u>Winter</u> factors.

18                                   **CONCLUSION**

19        Based on ExoTablet's failure to demonstrate likelihood of success on the merits of

20   its claim of infringement, the motion for preliminary injunction is DENIED.

21        Finally, ExoTablet has filed a motion to seal portions of its motion for preliminary

22   injunction, portions of the declaration of Peter David Warren, as well as certain exhibits

23   attached to the Warren declaration.  <u>See</u> Dkt. 14.  The court finds that the documents

24   sought to be sealed contain confidential information regarding ExoTablet's customers, and

25   further finds that ExoTablet has narrowly tailored its sealing request to cover only sealable

26   _____

27        [3]ExoTablet's post-hearing brief claims that the PadFone X was actually released on
     June 13, not on June 6.  Regardless of which date is correct, the fact remains that the accused
28   product was released while this motion was pending.

material, and thus GRANTS ExoTablet's motion to seal.

**IT IS SO ORDERED.**

Dated: August 12, 2014

_____
PHYLLIS J. HAMILTON
United States District Judge